**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------x

|   |   |   |
|---|---|---|
| FCCD LIMITED, | : | Index No.<br>Date Index No. Purchased:<br>February 5, 2010 |
|   | : |   |
| Plaintiff, | : |   |
|   | : | **SUMMONS** |
| v. | : | Plaintiff designates New York County<br>as the place of trial. |
|   | : |   |
| STATE STREET BANK AND TRUST<br>COMPANY and TRIMONT REAL<br>ESTATE ADVISORS, INC., | : | Venue is based upon CPLR §§ 503(a)<br>and 509. |
|   | : |   |
| Defendants. | : |   |

---------------------------------------------------x

**TO THE ABOVE NAMED DEFENDANTS**

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your answer on the Plaintiff's attorney, Allen & Overy LLP, within twenty (20) days after the service of the summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: New York, New York
          February 5, 2010

ALLEN & OVERY LLP

By: _____
          Jacob S. Pultman

1221 Avenue of the Americas
New York, NY 10020
(212) 610-6300
*Attorneys for Plaintiff*
*FCCD Limited*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
------------------------------------------------------x
                                        :
FCCD LIMITED,
                                        :               Index No.
                        Plaintiff,
                                        :
                                                        **COMPLAINT**
                v.                      :

                                        :

STATE STREET BANK AND TRUST             :
COMPANY and TRIMONT REAL
ESTATE ADVISORS, INC.,                  :

                        Defendants.     :
------------------------------------------------------x

Plaintiff, FCCD Limited ("FCCD"), for its complaint against defendants State Street Bank and Trust Company ("State Street") and TriMont Real Estate Advisors, Inc. ("TriMont"), alleges as follows:

## NATURE OF THE ACTION

1.      In this action, Plaintiff FCCD seeks to enforce its contractual rights in connection with its senior participation interest in a loan that was made to finance a land development project located in Cabo San Lucas, México. By this action, FCCD seeks damages from Defendants for their wrongful violations of the terms of the participation agreement between FCCD and State Street that govern the relationship and rights between FCCD, as the senior participant in the loan, and State Street, as the subordinate junior participant in the loan, and that govern the obligations of State Street and/or its designated servicing agent, TriMont, to service the loan on behalf of both of the participants. The underlying loan matured on July 1,

2009, the borrower failed to repay it, and the borrower has since abandoned the project. State Street and TriMont continue to act in contravention of the contractual relationship between the senior and junior participants in the loan by refusing to properly service and enforce the loan secured by this property and by refusing to transfer servicing to FCCD now that the value of State Street's interest has been reduced below the pre-agreed servicing transfer threshold of 25% of the original principal balance of State Street's junior interest, all in an effort to serve their own interests in violation of the participation agreement. As a result of State Street's and TriMont's wrongful actions, the value of the collateral securing the loan is rapidly deteriorating. Thus, State Street and TriMont are depriving FCCD of its bargained-for right as senior participant to take action to control its own destiny and try to recover its investment.

2.    FCCD is the undisputed owner of the senior participation interest in a $65,000,000 non-recourse loan made in 2006 to a "special purpose entity" borrower (i.e., a borrower whose only asset is the real property that it owns). The loan is secured by a first mortgage on the property and has been contractually divided into a senior portion and a junior portion pursuant to a participation agreement relating to the loan. As the owner of the senior interest, FCCD brings this action against State Street, the owner of the junior interest in the loan, and against TriMont, the party designated by State Street to service the loan. State Street has materially violated its obligations under the participation agreement in an effort to wrongfully deny FCCD of its right to take over the servicing and enforcement of the loan and by refusing to properly service and enforce the terms of the loan. TriMont has directly participated in and facilitated State Street's material breach by misconstruing the relevant provisions of the participation agreement to deny FCCD the right to take over the servicing of the loan and by servicing the loan in violation of the express servicing standard set forth in the participation

2

agreement and contrary to the customary standards of practice in the commercial real estate lending industry.

3.    As is standard in senior/subordinate commercial real estate lending transactions like this one, the holder of the senior participation accepts a lower interest rate than the interest rate payable by the borrower under the whole loan in exchange for receiving the benefit of less risk as, upon a default, the junior participant agrees that it will receive nothing until the senior participant is repaid in full; and the holder of the junior participation receives a higher interest rate and the initial right to service the whole loan in exchange for its agreement to absorb 100% of the loss realized after a default on the loan and to transfer servicing of the whole loan if that loss or an updated appraisal reduces the value of the junior participation below a pre-agreed percentage (typically 25%) of its original principal balance. The reason that servicing rights are transferred to the senior participant in such an event reflects the conventional market wisdom that the junior participant no longer has a meaningful economic interest in the property, and therefore no longer has the alignment of economic interest necessary to effectively service the loan on behalf of all of the participants. This event is referred to in the participation agreement as a "Control Appraisal Period" and, once it occurs, servicing rights are automatically transferred to the senior participant. The appraised value of the property securing the loan was $58,800,000 in July 2006 (which increased at the end of 2007 with the rise in the market and the granting of certain land use approvals and entitlements to over $100,000,000), and is $67,000,000 as of November 2009. However, State Street and TriMont refuse to acknowledge that, as a result of the borrower's default and the substantial decline in the value of the property since the loan was made, a Control Appraisal Period exists and the valuable rights to service and enforce the loan on behalf of the senior and junior participants have now been contractually

3

transferred to FCCD under the terms of the participation agreement. Therefore, FCCD seeks a declaration by this action that it now has the contractual right to service the loan at issue. FCCD also seeks damages for State Street's material breach of its obligations under the participation agreement and for TriMont's tortious interference with State Street's obligations under that agreement.

## THE PARTIES

4.    Plaintiff FCCD is an Irish limited liability company with its principal place of business at Bracetown Business Park, Clonee in the County of Meath, Republic of Ireland.

5.    Upon information and belief, Defendant State Street is a Massachusetts trust company and a wholly-owned subsidiary of State Street Corporation with its principal place of business at 1 Lincoln Street, Boston, Massachusetts 02111.

6.    Upon information and belief, Defendant TriMont is a Georgia corporation with its principal place of business at 3424 Peachtree Road NE, Suite 2200, Atlanta, Georgia 30326.

## JURISDICTION AND VENUE

7.    Personal jurisdiction is proper over the Defendants pursuant to CPLR §§ 302(a)(1)-(4).

8.    Venue is proper in this County pursuant to CPLR §§ 503(a) and 509.

4

## FACTUAL ALLEGATIONS

### A.    The Loan

9.     On or about July 21, 2006, Lehman Brothers Holdings Inc. ("LBHI") made a loan (as amended, the "Loan") in the original principal amount of up to $65,000,000 pursuant to a loan agreement (as amended, the "Loan Agreement") between Logan Hotels and Resorts, México, S.A. de C.V., as borrower ("Logan Borrower"), and LBHI, as lender.  The Loan was principally secured by a first mortgage lien on an unimproved and vacant parcel of land located in Cabo San Lucas, Baja California Sur, México (the "Property").  The mortgage lien was created through a trust agreement registered with the Public Registrar of Property and Commerce in Los Cabos, Baja California Sur, México, the beneficiary of which is LBHI (the "Mortgage").

10.     On or about May 31, 2007, an Omnibus Amendment to Loan Documents was executed and delivered by and among LBHI, Logan Borrower, Cabo San Cristobal Racing Circuit, S.A. de C. V. formerly known as Cabo San Lucas Cristobal Golf Resorts, S.A. de C.V. ("Racetrack Borrower" and, together with Logan Borrower, collectively, the "Borrower"), Albert Maes ("Maes"), Logan International LLC ("Logan INT") and Logan Hotels and Resorts Development Co. PTE., Ltd. ("Logan Hotels", and, together with the Borrower, Maes and Logan

and this $3,000,000 increase is not covered or governed by the participation agreement. For this reason, references to the Loan shall exclude the $3,000,000 increase to develop the Racetrack Property, except as expressly provided to the contrary in this Complaint. A copy of the Loan Agreement, as amended, is attached hereto as Exhibit A.

### B.    The Property

11.    The Loan was made for the acquisition and pre-development work by the Borrower of approximately 840 acres of property located in Cabo San Lucas, Baja California Sur, México, a portion of which is prime oceanfront property (and, together with the Racetrack Property that was later added, the "Property"). The Property (excluding the Racetrack Property) was to be developed in five separate phases. The first three phases would involve primarily hotels, villas and fractional beach residences with the remaining two phases to include an 18 hole golf course, a retail village, and additional residential developments. The Borrower intended to obtain necessary land use permits and do certain pre-development and infrastructure work so that it could then sell off lots to other developers. The Borrower intended to use the proceeds of these sales to repay the Loan. In recognition of the fact that the Property would not be income-producing during this pre-development phase, 100% of the interest accruing on the Loan was PIK (payment-in-kind) interest, meaning that it accrued and was added to the principal balance of the Loan, but was not payable until the maturity or earlier repayment of the Loan. The Loan was not fully funded at closing and was not fully funded when FCCD purchased its senior participation in the Loan from LBHI in January 2007 (as further discussed in Paragraph 13 below). Rather, FCCD funded the full $32,500,000 principal amount of its senior participation in the Loan and subsequent fundings were scheduled to be disbursed from time to time to the Borrower solely by LBHI upon the Borrower's compliance with the disbursement requirements

6

set forth in the Loan Agreement. These subsequent disbursements were to be made to fund certain of the Borrower's land use and other pre-development costs. Approximately $63,445,080 of the original principal amount of the $65,000,000 Loan has been funded to date. Since LBHI filed its petition under Chapter 11 of the US Bankruptcy Code on September 15, 2008, LBHI failed to fund any pending and subsequent disbursement requests made by the Borrower. None of these disbursement requests have been funded by FCCD or, to FCCD's information and belief, State Street since State Street assumed the Loan from LBHI (as further discussed in Paragraph 20 below). Approximately $1,554,920 of the Loan remains unfunded as of the date hereof.

12.    The Borrower has obtained certain valuable land use approvals and performed certain pre-development work but has been unable to sell, and in fact has not sold, any of the development parcels as planned to repay the Loan. The Loan matured without repayment on July 1, 2009, and the Borrower Parties are either unable or unwilling to expend any more of their own funds to develop or even maintain or otherwise protect the Property. The Property has been abandoned by the Borrower. The lenders have funded an extension of insurance coverage for the Property due to this neglect; however, significant risks remain that threaten the further deterioration in value of the Property, including the increased risk of squatters on the now-abandoned Property, the expiration of valuable land use approvals and the fact that the Property will remain fallow. No action has been taken to foreclose the Mortgage on the Property so that the lenders can acquire it, sell it and recover all or a portion of the Loan.

**C.    FCCD's Senior Participation Interest**

13.    In January 2007, LBHI sold to Plaintiff FCCD a "senior participation" interest in the Loan. To effectuate the sale, FCCD and LBHI entered into a Loan Participation

7

Agreement, dated January 19, 2007 (as amended, the "Participation Agreement"). A copy of the Participation Agreement is attached hereto as Exhibit B.

14. Pursuant to the Participation Agreement, FCCD purchased and received from LBHI an undivided "senior participation" interest (the "Senior Participation") in the Loan in the original principal amount of $32,500,000. LBHI retained for itself the "junior participation" interest (the "Junior Participation"), so called because its right to receive any payments following an event of default under the Loan are wholly subordinate to the repayment in full of FCCD's Senior Participation. Thus, upon a default, 100% of the loss attributable to the Loan is first allocated to the Junior Participation, which, for this very reason, is referred to as being in the "first loss" position. Specifically, the Participation Agreement provides that "[a]t any time that an Event of Default shall have occurred and be continuing, all amounts received by [LBHI] with respect to the Loan shall be applied to the extent of all such received amounts in the following order of priority: (A) first, to pay to Servicer any Unreimbursed Costs; (B) second, to pay to Senior Participant interest on the outstanding Senior Participation Amount at the Interest Rate; (C) third, to pay to Senior Participant the Participation Amount; (D) fourth, to pay to [LBHI] all sums due and payable to [the Junior Participation] . . . ." See Exhibit B ¶ 3(ii). Additionally, the Participation Agreement provides that "to the extent that (i) any accounts held by the Lender under the Loan Documents (or by any servicer), (ii) any principal prepayments of the Loan is made in whole or in part, or (iii) any payment is made on account of principal on the Maturity Date, such funds in respect of the principal balance of the Loan shall be applied to reduce the principal amount of Senior Participant's Participation, and, upon the repayment in full of Senior Participant's Participation and all sums due with respect thereto, the balance, if any, to [LBHI] in respect of the [Junior Participation]." See id. ¶ 3(b).

8

15.    At the time of the sale of the Senior Participation to FCCD, the principal portion of the Loan allocable to the Junior Participation was $14,040,354.84.  After the sale of the Senior Participation to FCCD, LBHI made several, but not all, of the additional advances to the Borrower.  If the Loan were fully funded by LBHI, the principal portion of the Loan allocable to the Junior Participation would have been $32,500,000, but as the future advance amount of $1,554,920 was not funded, the principal portion of the Loan (excluding the $3,000,000 increase in the Loan funded solely by LBHI with respect to the Racetrack Property that is not governed by the Participation Agreement) allocable to the Junior Participation is now $30,945,080.

16.    As of February 1, 2010 the outstanding balance (including outstanding principal and accrued PIK interest) of the Loan, and the allocation of these values to the Junior Participation and Senior Participation, is as follows:

|  | Outstanding Loan Principal Balance (excluding the increase for the Racetrack Property) | Outstanding Loan Accrued PIK Interest | Total Outstanding Loan Amount (Principal Balance and Accrued PIK Interest) | Appraised Value of Property |
|---|---|---|---|---|
| **Total** | $63,445,080 | $39,060,593 | $102,505,673 | $67,000,000 |
| **Senior Participation** | $32,500,000 | $18,263,194 | $50,763,194 | N/A |
| **Junior Participation** | $30,945,080 | $20,797,399 | $51,742,479 | N/A |

17.    As is the industry standard in structuring the sale of participation interests in loans in the commercial real estate lending market, pursuant to the Participation Agreement,

9

LBHI retained legal title to the Loan and the right and obligation to service the Loan on behalf of both participants. Servicing rights are of value in commercial real estate lending transactions because they give the holder of those rights the ability to control essential decision making with respect to enforcement of a loan following a default.

18.     As is also customary in senior/subordinate participation structures in the commercial real estate lending market, the Junior Participation holder was granted the right to service the Loan on behalf of all participants because it would suffer the "first loss" in the event the Loan was not repaid in full. The tradeoff for assuming "first loss" exposure is typically a higher interest rate than the senior participant and the right to protect the "first loss" position by controlling servicing. This right to control servicing and protect the "first loss" position is lost when the value of the collateral is reduced to the point where the junior participant has little or no economic value left in its junior participation and, under the conventional market practice, at this point the interests of the participants are no longer aligned as the junior participant has little or no value left to protect and lacks the economic incentive necessary to service the loan in the best interest of the senior participant, which does have significant value left to protect.

19.     Reflecting this market practice, as further discussed in Paragraph 25 below, upon the occurrence of a default, the Participation Agreement requires the "Servicer" to order an appraisal of the Property, to calculate whether the appraised value of the Property has declined substantially enough to trigger a change in servicing control—a "Control Appraisal Period"—and to promptly notify the Loan participants in writing as to whether a Control Appraisal Period exists. Servicing rights are automatically transferred to the Senior Participation holder once a Control Appraisal Period occurs.

**D.     Assignment of Loan to State Street**

20.     On November 19, 2008, State Street filed an adversary action in United

States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") against

LBHI and Lehman Commercial Paper Inc. ("LCPI") seeking, among other things, a declaratory

judgment that State Street owns the Loan.  Despite the commencement of this action, questions

surrounding the ownership of the Loan remained unresolved for over a year, whereupon on

October 13, 2009, FCCD was compelled to file a motion to intervene in the Bankruptcy Court

adversary action seeking a declaratory judgment with respect to the rights of the parties.  Forced

to take action by FCCD's motion to intervene, on December 2, 2009, counsel for LBHI provided

counsel for FCCD with an executed assignment and assumption agreement (the "Assignment and

Assumption Agreement") that assigned all "right, title and interest" of LBHI in the Loan to State

Street.  The assignment of all right, title and interest in the Loan includes the assignment to State

Street of the Junior Participation and LBHI's right to service the Loan.   A copy of the

Assignment and Assumption Agreement is attached hereto as Exhibit C.

21.     Despite the execution and delivery of the Assignment and Assumption

Agreement, to date, LBHI still remains the registered beneficiary of the Mortgage.  Despite

claiming to own the Loan for over a year, and now formally owning the Loan since December 2,

2009, upon information and belief, State Street has not attempted to effectuate the transfer of the

beneficial interest in the Mortgage, the transfer of which can be a time-consuming and lengthy

process.  As a result, LBHI continues to be the only party with the legal ability under Mexican

law to bring a foreclosure proceeding on the Mortgage to realize upon the sole source of

collateral for the Loan—the Property—and try to recover some of the funds loaned to the

Borrower under the Loan.  Even if it wanted to take action to enforce the Loan, State Street

currently lacks the legal ability to do so due to its inaction.  The failure to date to properly transfer LBHI's rights as the beneficiary under the Mortgage continues to cause further losses and injury to the Loan collateral as neither State Street nor its servicer, TriMont, can even initiate the foreclosure of the Mortgage.

**E.    Servicing Rights**

22.    The Participation Agreement provides that the "Controlling Holder" of the Loan has the right to administer and service the Loan itself or, at its sole expense, to designate an agent to act as Servicer to perform its administration and servicing obligations.  Servicing rights give the Controlling Holder, among other things, the ability to control essential decision making with respect to the enforcement of the Loan following a default by the Borrower.

23.    To protect the interests of all participants, the Controlling Holder and its Servicer are obligated to follow the "Accepted Servicing Practices" set forth in the Participation Agreement.  Specifically, Accepted Servicing Practices require a Controlling Holder and its Servicer to administer the Loan with the "same care, skill, prudence and diligence with which such Person services and administers similar participation interests for other third party portfolios, giving due consideration to customary and usual standards of practice of prudent institutional commercial lenders servicing their own loans or participations in loans . . . ."  See Exhibit B ¶ 1.  Similarly, the Controlling Holder and Servicer must each act with "the same care, skill, prudence and diligence which such Person utilizes for loans or participations in loans which such Person owns for its own account, in each case, acting in accordance with applicable law, the terms of this [Participation] Agreement [and] the Loan Documents and with a view to the maximization of timely recovery of principal and interest on the Loan as a whole, but without regard to . . . (d) such Person's right to receive compensation for its services [under the

12

Participation Agreement] or with respect to any particular transaction; or (e) the ownership, or servicing or management for others, by such Person or any sub-servicer, of any other participations, loans or properties." See id.

      24.    On the date of execution of the Participation Agreement, LBHI was the Controlling Holder of the Loan. As the Controlling Holder, LBHI appointed TriMont as its Servicer to service and administer the Loan. At all times since FCCD acquired the Senior Participation in the Loan, TriMont has acted as Servicer of the Loan. At all times since the execution of the Assignment and Assumption Agreement by State Street, LBHI and LCPI, TriMont has continued to act as Servicer of the Loan. Even before State Street formally assumed LBHI's rights and obligations under the Loan and the Participation Agreement, State Street retained TriMont as its Servicer for the Loan when it retained TriMont to service a large portfolio of other real estate loans and properties acquired by State Street from LBHI and LCPI. TriMont's servicing contract for this portfolio of loans generates substantial servicing fees for TriMont. Upon information and belief, TriMont's ability to service the Loan in accordance with Accepted Servicing Practices has been affected adversely by its receipt of compensation from State Street for its services under the larger and lucrative servicing assignment that it has with State Street. This relationship of TriMont with State Street is in violation of the express prohibitions of the Accepted Servicing Practices under which State Street and TriMont are obligated to service the Loan on behalf of FCCD.

      25.    A fundamental principle of senior/subordinate participation arrangements for commercial mortgage loans is that the party that holds the first loss position also holds the right to service the loan to protect its higher risk position but that it loses this servicing right if the value of the underlying collateral declines to the point that it no longer has a meaningful

economic stake in the loan. This principle is based on the rationale that a first loss holder that no longer has a meaningful economic interest will no longer be sufficiently aligned with the senior creditors to permit it to make decisions that are in the best interest of those senior creditors. The occurrence or non-occurrence of a "Control Appraisal Period" is the mechanism in the Participation Agreement that measures whether the Junior Participation holder still has a meaningful economic interest in the Loan to permit it to continue servicing the Loan on behalf of the Senior Participation. Upon the occurrence of a Control Appraisal Period, the Participation Agreement provides for an automatic transfer of the right to appoint the Servicer from the Junior Participation holder (whether LBHI or a successor like State Street) to FCCD, the Senior Participation holder. The procedure for determining whether a Control Appraisal Period exists is detailed in Section 18 of the Participation Agreement and discussed in detail in Paragraph 37 below. The purpose of this provision is to ensure that the holder of the Junior Participation will be properly motivated to service and enforce the Loan, and that the holder of the Senior Participation will be able to protect its interests if the holder of the Junior Participation is not so motivated.

### F.    Maturity Default

26.    On July 1, 2009, the Loan matured, at which point the entire amount of the principal, all of the accrued PIK interest and all other amounts payable under the Loan became due (the "Maturity Default"). The amount to repay the Loan as of February 1, 2010 is approximately $102,505,673, and that amount increases daily by the addition of interest accruing at the default rate of 20%, compounded monthly. This daily amount adds to the principal balance of the Loan $42,288 per day for each day from February 1, 2010 through February 9, 2010, and that daily amount increases thereafter once the accrued PIK interest for the prior

14

interest period is added to the outstanding principal balance of the Loan. It is important to note that while these additional amounts are added to the whole Loan, and are apportioned between State Street and FCCD based on their respective, pro rata shares in the Loan, because the Loan is in default, the Junior Participation held by State Street is worth substantially less each day as 100% of all amounts recovered on the Loan must be first paid to FCCD before State Street receives a dollar. Although the Loan Agreement allowed the Borrower to extend the date of maturity of the Loan to July 1, 2010 subject to certain conditions, the Borrower did not elect this extension. Since the Maturity Default, and despite receiving notice of the Maturity Default, the Borrower has taken no action to repay any portion of the Loan, nor is it likely to do so.

27.    On June 1, 2009, in anticipation of the looming Maturity Default and

Participation Agreement "to [maximize the] timely recovery of principal and interest on the Loan as a whole", no foreclosure proceeding or other enforcement action has occurred.

### G.     Calculation of Control Appraisal Period

29.     The Maturity Default constitutes an "Event of Default" under the Loan Agreement.  Upon the occurrence of an Event of Default, the Participation Agreement requires the Servicer to order an appraisal of the Property, to make a determination of whether a Control Appraisal Period has occurred, and to promptly notify the Loan participants in writing as to whether a Control Appraisal Period exists.

30.     Following the Maturity Default and after ordering an appraisal of the Property, TriMont sent a letter to FCCD on December 2, 2009 (the "TriMont Notice") notifying FCCD that a Control Appraisal Period did not exist with respect to the Loan.  A copy of the TriMont Notice is attached hereto as Exhibit F.

31.     On December 4, 2009, FCCD sent a letter to TriMont (the "FCCD Letter") informing it of the existence of two fundamental errors in the TriMont Notice.  The two errors miscalculated and misallocated the "Appraisal Reduction Amount," an amount that is fundamental to the calculation of whether a Control Appraisal Period exists.  A copy of the FCCD Letter is attached hereto as Exhibit G.

32.     TriMont's first, and by far most significant, error was that it allocated the Appraisal Reduction Amount ratably between the Senior Participation and the Junior Participation on a pro rata basis in accordance with their participation interest percentages, rather than properly allocating it 100% to the first loss Junior Participation.  As defined in the Participation Agreement, the Appraisal Reduction Amount represents the reduction in the value of the Property that secures the Loan, whether realized or based on a recent appraisal of the

Property, from the inception of the Loan until the date of the loss or the new appraisal. The Participation Agreement allocates 100% of the loss represented by the Appraisal Reduction Amount to the Junior Participation to determine whether a Control Appraisal Period exists. Specifically, the Participation Agreement provides that upon an Event of Default, "all amounts received by Lehman with respect to the Loan shall be applied to the extent of all such received amounts *in the following order of priority*: (A) first, to pay to Servicer any Unreimbursed Costs; (B) second, *to pay to Senior Participant interest on the outstanding Senior Participation Amount at the Interest Rate; (C) third, to pay to Senior Participant the Participation Amount*; [and] (D) fourth, to pay . . . all sums due and payable to [the Junior Participation holder] other than its portion of the Additional Fee . . . ." See Exhibit B ¶ 3(ii) (emphasis added). Accordingly, following an Event of Default, the first loss Junior Participation receives nothing until 100% of the principal and accrued interest on the Senior Participation has been paid in full. Not only is allocating the entire loss to the Junior Participation holder required by the express terms of the Participation Agreement cited above, but doing so is entirely consistent with "Accepted Servicing Practices" and standard industry practice to determine whether a junior participant or junior creditor has the requisite economic interest in the underlying loan to properly service the loan in the best interests of the senior participant or senior creditor.

33.    Notwithstanding the clear terms of the Participation Agreement and accepted servicing practice in the real estate industry, the TriMont Notice allocates only 48.77% of the "Appraisal Reduction Amount" to State Street's Junior Participation and allocates 51.23% to FCCD's Senior Participation. These percentages correspond to the respective "Pro Rata Shares", or participation interest percentages, of State Street and FCCD in the Loan; however, allocating the loss evidenced by the Appraisal Reduction Amount ignores the fundamental

17

subordination of 100% of all loss to the Junior Participation now that the Loan is in default. The TriMont Notice effectively makes the Junior Participation *pari passu* with, and not subordinate to, the Senior Interest. Although the Participation Agreement does contain a defined term for the participants' respective "Pro Rata Shares," this defined term is not used in any provision that relates to the calculation of the Control Appraisal Period. Thus, the Participation Agreement clearly provides that FCCD holds a senior interest that is entitled to the first right of repayment, and, as such, the loss on the Loan—represented by the Appraisal Reduction Amount—should be allocated in its entirety to the holder of the Junior Participation. By doing so, a Control Appraisal Period would exist and the right to service the Loan would transfer to FCCD.

34.    The FCCD Letter also noted that TriMont made an <u>additional</u> error by calculating the accrued interest on the Loan at a rate of 12.5% per annum. The 12.5% interest rate is the interest rate that the Junior Participation holder agreed to pay to FCCD under the Participation Agreement. However, the Loan Agreement specifically provides for a (non-default) interest rate of 15% per annum, which represents the interest rate that the Borrower agreed to pay to the holder of the Loan. Because the Control Appraisal Period serves to measure the Junior Participation holder's stake in the Loan, the 15% interest rate should have been used to determine whether a Control Appraisal Period exists.

35.    It is also clear from the terms of the Participation Agreement that accrued interest should be calculated using the 15% interest rate found in the Loan Agreement. Although the Participation Agreement defines "Interest Rate" as "12.5%," this defined term is used only to describe the contractual obligation of the Junior Participation holder to pay FCCD interest on its Senior Participation and is notably absent from all of the provisions that relate to the calculation of the Control Appraisal Period. Instead, the Participation Agreement does not contain a defined

18

term for interest payable by the Borrower under the Loan, but rather refers, in the definition of "Appraisal Reduction Amount" that is embedded in the Control Appraisal Period definition, to "all accrued and unpaid interest (other than default interest) on the Loan at a per annum rate equal to the applicable interest rate (exclusive of any default interest)." That applicable interest rate on the Loan (exclusive of any default interest) is 15%.

36.    Although FCCD requested that TriMont correct these errors, TriMont sent a letter to FCCD on December 23, 2009 (the "TriMont Response Letter") refusing to correct the TriMont Notice. A copy of the TriMont Response Letter is attached hereto as Exhibit H.

37.    The correct calculation of the Control Appraisal Period is set forth in the charts below and a more detailed calculation is contained on the spreadsheet attached hereto as Exhibit I:

The "Appraisal Reduction Amount" is the excess of (a) minus (b) below:

| (a) the sum of: | |
|---|---|
| (i) the outstanding principal balance of the Loan plus | (i) = $63,445,080 |
| (ii) the accrued and unpaid interest (other than default interest) on the Loan at a per annum rate equal to the applicable interest rate (exclusive of any default interest) plus | (ii) = $39,060,593 |
| (iii) all unreimbursed Costs and unpaid interest thereon at the Applicable Servicer Rate and any unpaid interest on any principal and interest advances with respect to the Loan plus | (iii) = $0 |
| (iv) all currently due and unpaid real estate taxes and assessments and insurance premiums relating to the [Property] (less any amounts held in escrow for such items) [Note: this figure is an estimated amount; precise amount is unknown but that does not materially alter the conclusion.] | (iv) = $20,967 |
| (a) Total of (i), (ii), (iii) and (iv) = $102,526,640 | |

minus

| (b) the Collateral Value of the [Property] as determined by an appraisal performed pursuant to [the Participation] Agreement | $67,000,000 |
|---|---|

| Appraisal Reduction Amount is (a) $102,526,640 over (b) $67,000,000 = $35,526,640 |
|---|

After calculating the "Appraisal Reduction Amount," a Control Appraisal Period exists if and so long as clause (a) in the chart below is less than clause (b):

| | | |
|---|---|---:|
| (a)(i) | the Lehman Interest Principal Balance plus the Undisbursed Lehman Interest, <u>minus</u> | $32,500,000 |
| (a)(ii) | the sum of | |
| | (A) any payments of principal allocated to, and received on, the Lehman Interest | $0 |
| | (B) any Appraisal Reduction Amounts allocated to the Lehman Interest | $35,526,640 |
| | (C) any Realized Principal Loss allocated to the Lehman Interest | $0 |
| | | $35,526,640 |
| (a)(i) minus (a)(ii) | | |
| **Total of clause (a)** | | ($3,026,640) |
| | | |
| (b) | 25% of the Lehman Interest Principal Balance plus the Undisbursed Lehman Interest | $32,500,000 x  0.25 |
| **Total of clause (b)** | | $8,125,000 |

Since clause (a) (<u>negative</u> $3,026,640) is less than clause (b) ($8,125,000), a Control Appraisal Period undoubtedly exists.

        38.    Based on the plainly erroneous calculations contained in the TriMont Letter, State Street and TriMont incorrectly contend that a Control Appraisal Period has not yet occurred, and, therefore, servicing rights for the Loan have not been transferred to FCCD. Had TriMont utilized the correct standard on its calculations, the Control Appraisal Period that

currently exists would be plain, and, as such, the servicing rights would have been transferred to FCCD.

39.    The Participation Agreement requires the Loan to be serviced in accordance with Accepted Servicing Practices, which incorporates the customary and usual standards of practice of the commercial lending industry, and requires TriMont to service the Loan without regard to other loans it services for State Street or other servicing fees it receives from the billion dollar plus portfolio of loans of which this Loan is a part. Despite this obligation to service the Loan in accordance with Accepted Servicing Practices, State Street and TriMont have ignored standard industry practice by misallocating a portion of the Appraisal Reduction Amount to the Senior Participation in order to maintain control over the servicing of the Loan for their own wrongful purposes. In addition, State Street and TriMont have ignored the contractual obligation to recover principal and interest on the Loan on a timely basis and to service the Loan in the best interest of all participants, not just themselves, by refusing to commence a foreclosure proceeding or take any other legal action against the Borrower. The reasons for doing so are clear: State Street is trying to buy time to allow for an economic rebound to restore meaningful economic value to its subordinate position and to avoid being substantially wiped out by a foreclosure; TriMont is aware that FCCD will service the Loan through one of its affiliates and so, if TriMont declares that a Control Appraisal Period exists, it will lose its lucrative servicing fees for this Loan. This self-serving inaction is wasting precious enforcement time and is now jeopardizing FCCD's ability to exercise its bargained-for rights to protect the remaining value of the collateral and its first priority Senior Participation in the Loan.

## FIRST CAUSE OF ACTION AGAINST
## <u>STATE STREET AND TRIMONT</u>

### <u>Declaratory Judgment</u>

40.    FCCD repeats and realleges each of the allegations made in Paragraphs 1 through 39 of the complaint as if fully stated herein.

41.    Under the Participation Agreement, the Senior Participation holder becomes the Controlling Holder of the Loan upon the existence of a Control Appraisal Period. Consistent with the terms of the Participation Agreement providing for FCCD's first right of repayment, proper calculation of the Control Appraisal Period requires 100% of the Appraisal Reduction Amount to be allocated to the Junior Participation holder.  In addition, in calculating the Control Appraisal Period, the accrued interest should be calculated at 15% per annum, the rate provided in the Loan Agreement.  Calculation under this method demonstrates that a Control Appraisal Period currently exists and that FCCD is the Controlling Holder of the Loan with the right to service it.

42.    Defendants maintain that only 48.77% of the Appraisal Reduction Amount should be allocated to the Junior Participation and accrued interest should be calculated at 12.5% per annum, the rate of interest payable to FCCD on its Senior Participation as provided in the Participation Agreement.  Defendants thereby contend that a Control Appraisal Period does not exist and that FCCD is not the Controlling Holder of the Loan.

43.    A substantial and actual controversy exists with respect to which participant is currently the Controlling Holder of the Loan.

23

44.     A declaration of the Controlling Holder is critical so that FCCD may realize its right to service the Loan, to protect the remaining value of the collateral and to enforce the Loan to maximize the timely recovery of principal and interest for the participants.

45.     By reason of the foregoing, FCCD seeks a declaration that a Control Appraisal Period exists and that FCCD is the Controlling Holder of the Loan.

## SECOND CAUSE OF ACTION
## AGAINST STATE STREET

### Breach of Contract

46.     FCCD repeats and realleges each of the allegations made in Paragraphs 1 through 45 of the complaint as if fully stated herein.

47.     The Participation Agreement requires the Junior Participation holder to adhere to Accepted Servicing Practices and to use an appropriate level of care, skill, prudence and diligence with respect to the Loan. Additionally, the Junior Participation holder's Servicer must administer the Loan with the same care, skill, prudence and diligence with which such Person services and administers similar participation interests for other third party portfolios, giving due consideration to customary and usual standards of practice of prudent institutional commercial lenders servicing their own loans or participations in loans, and to take actions that maximize the timely recovery of principal and interest on the whole Loan, in each case without regard to other loans it may service or other compensation it may receive.

48.     State Street has allowed TriMont to continue to act as Servicer of the Loan, despite TriMont's erroneous calculations with respect to the Control Appraisal Period and the Appraisal Reduction Amount. State Street and TriMont have deliberately delayed the foreclosure of the Mortgage and enforcement of the Loan in order to protect State Street's

subordinate (and economically impaired) Junior Participation and TriMont's lucrative servicing contract. State Street's failure to properly service and enforce the Loan is a material breach of its obligations under the Participation Agreement.

49.     By reason of the foregoing, FCCD has suffered damages in an amount to be determined at trial, including but not limited to, losses on the Loan, impairment of the Property as collateral for repayment of the Loan, and expenses related to determining the Controlling Holder of the Loan and other related issues.

## THIRD CAUSE OF ACTION
## AGAINST STATE STREET

### Breach of the Implied Covenant of Good Faith and Fair Dealing

50.     FCCD repeats and realleges each of the allegations made in Paragraphs 1 through 49 of the complaint as if fully stated herein.

51.     The Participation Agreement imposes on State Street an implied obligation to act in good faith and deal fairly with FCCD in connection with the agreement and with the Loan.

52.     State Street has frustrated the purpose of the Participation Agreement by, among other things, failing to properly service and enforce the Loan in an effort to wrongfully deny FCCD of its benefits under the agreement.

53.     By reason of the foregoing, FCCD has suffered damages in an amount to be determined at trial.

25

## FOURTH CAUSE OF ACTION
## AGAINST TRIMONT

### Tortious Interference with Contract

54.     FCCD repeats and realleges each of the allegations made in Paragraphs 1 through 53 of the complaint as if fully stated herein.

55.     TriMont is aware that FCCD is a party to the Participation Agreement, as TriMont reviewed the Participation Agreement in its calculations relating to the Control Appraisal Period and the Appraisal Reduction Amount. State Street has materially breached its obligations under the Participation Agreement. TriMont provided erroneous calculations to State Street that induced State Street to breach the Participation Agreement. TriMont's wrongful actions are contrary to the customary and usual standards of practice of the commercial lending industry and violate the servicing standards and the other provisions set forth in the Participation Agreement.

56.     By reason of the foregoing, FCCD has suffered damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(i) enter a declaratory judgment declaring that FCCD is the Controlling Holder of the Loan;

(ii) enter a judgment awarding damages in an amount to be determined at trial, together with interest;

26

(iii) awarding FCCD the fees, costs and expenses of this action, including attorney's fees; and

(iv) granting such further and other relief as this Court deems just and proper.

Dated: New York, New York
       February 5, 2010

ALLEN & OVERY LLP

By: _____
        Jacob S. Pultman
        Reginald Schafer

1221 Avenue of the Americas
New York, NY 10020
(212) 610-6300

*Attorneys for Plaintiff*
*FCCD Limited*

27

# EXHIBIT A

# LOAN AGREEMENT

**for a loan in an amount up to**

**$65,000,000**

## MADE BY AND BETWEEN

## LOGAN HOTELS AND RESORTS, MEXICO, S.A. DE C.V.

**a Mexican corporation,**

**as Borrower**

**and**

## LEHMAN BROTHERS HOLDINGS INC.,

**a Delaware corporation,**
**as Lender**

Dated as of July 21, 2006

"Logan Cabo San Cristobal", Cabo San Lucas, Baja California Sur, Mexico

## TABLE OF CONTENTS

**ARTICLE I**    INCORPORATION OF RECITALS AND EXHIBITS ...............................1
    Section 1.1    Incorporation of Recitals..............................................................................1
    Section 1.2    Incorporation of Exhibits. ............................................................................1

**ARTICLE II**    DEFINITIONS...............................................................................................1
    Section 2.1    Defined Terms. ..............................................................................................1

**ARTICLE III**    REPRESENTATIONS AND WARRANTIES..............................................13
    Section 3.1    Representations and Warranties...................................................................13
    Section 3.2    Reaffirmation of Representations and Warranties.......................................16

**ARTICLE IV**    LOAN AND LOAN DOCUMENTS............................................................16
    Section 4.1    Agreement to Borrow and Lend. .................................................................16
    Section 4.2    Loan Documents. .........................................................................................17
    Section 4.3    Term of the Loan. ........................................................................................18
    Section 4.4    Prepayments.................................................................................................19
    Section 4.5    Late Charge. .................................................................................................19

**ARTICLE V**    INTEREST AND ADDITIONAL FEE .........................................................19
    Section 5.1    Interest Rate. ................................................................................................19
    Section 5.2    Additional Fee..............................................................................................20

**ARTICLE VI**    LOAN EXPENSE AND ADVANCES .........................................................20
    Section 6.1    Loan and Administration Expenses. ...........................................................20
    Section 6.2    Brokerage Fees.............................................................................................20
    Section 6.3    Protective Advances.....................................................................................21

**ARTICLE VII**    CONDITIONS TO THE MAKING OF THE LOAN...................................21
    Section 7.1    Conditions Precedent. ..................................................................................21

**ARTICLE VIII**    CONDITIONS PRECEDENT TO THE FIRST  DISBURSEMENT FOR
                           CONSTRUCTION COSTS .........................................................................22
    Section 8.1    Required Construction Documents. .............................................................22

**ARTICLE IX**    OVERALL BUDGET....................................................................................23
    Section 9.1    Overall Budget. ............................................................................................23
    Section 9.2    Budget Line Items.........................................................................................24
    Section 9.3    Contingency Reserve. ..................................................................................24
    Section 9.4    Tax and Insurance Reserve. .........................................................................24

**ARTICLE X**    SUFFICIENCY OF LOAN............................................................................25
    Section 10.1    Loan In Balance. ..........................................................................................25

**ARTICLE XI**   CONSTRUCTION PAYOUT REQUIREMENTS.................................25
    Section 11.1   Documents to be Furnished for Each Disbursement.....................25
    Section 11.2   Retainage..........................................................................................26

**ARTICLE XII**   FINAL DISBURSEMENT FOR CONSTRUCTION COSTS...................26
    Section 12.1   Final Disbursement for Construction Costs.................................26
    Section 12.2   Retainage..........................................................................................27

**ARTICLE XIII**   COVENANTS ......................................................................................27
    Section 13.1   Certain Covenants.............................................................................27
    Section 13.2   Insurance...........................................................................................31
    Section 13.3   Special Purpose Covenants. ............................................................33

**ARTICLE XIV**   CASUALTY AND CONDEMNATION ...............................................35
    Section 14.1   Lender's Election to Apply Proceeds to the Debt.........................35
    Section 14.2   Borrower's Obligation to Rebuild. ................................................35

**ARTICLE XV**   TRANSFERS .......................................................................................36
    Section 15.1   Prohibition of Assignments and Transfers by Borrower. ...........36
    Section 15.2   Prohibition of Transfers in Violation of ERISA. ........................37
    Section 15.3   Successors and Assigns....................................................................37

**ARTICLE XVI**   SPECIAL PROVISIONS RE: PARTICULAR PHASES .......................37
    Section 16.1   Future Opportunities. ......................................................................37
    Section 16.2   Minimum Release Prices..................................................................39
    Section 16.3   Opportunities upon Maturity or Sooner Prepayment...................41

**ARTICLE XVII**   SERVICER ..........................................................................................41
    Section 17.1   Servicer.............................................................................................41

**ARTICLE XVIII**   EVENTS OF DEFAULT .....................................................................41
    Section 18.1   Events of Default. .............................................................................41

**ARTICLE XIX**   LENDER'S REMEDIES IN EVENT OF DEFAULT............................43
    Section 19.1   Remedies Conferred Upon Lender. ................................................43

**ARTICLE XX**   GENERAL PROVISIONS ..................................................................43
    Section 20.1   Captions............................................................................................43
    Section 20.2   Modification, Waiver.......................................................................43
    Section 20.3   Governing Law. ................................................................................43
    Section 20.4   Acquiescence Not to Constitute Waiver of Lender's Requirements. ..........44
    Section 20.5   Disclaimer by Lender. .....................................................................44
    Section 20.6   Partial Invalidity; Severability. ......................................................44
    Section 20.7   Definitions Include Amendments. ..................................................45
    Section 20.8   Execution in Counterparts................................................................45
    Section 20.9   Entire Agreement. ............................................................................45
    Section 20.10   Waiver of Damages..........................................................................45
    Section 20.11   Jurisdiction.......................................................................................45

HF 3329787v.8 #04737/0110 07/21/2006

Section 20.12    Set-Offs...........................................................................46
Section 20.13    Authorized Representative........................................................46
Section 20.14    Non-Recourse Provisions..........................................................46
Section 20.15    Time is of the Essence. ..........................................................46

**ARTICLE XXI**        NOTICES..................................................................46

**ARTICLE XXII**       WAIVER OF JURY TRIAL.......................................................47

**ARTICLE XXIII**      GROSS-UP ................................................................48
Section 23.1    Gross-Up ..............................................................................48

**ARTICLE XXIV**       SALE OF NOTE AND SECURITIZATION ...............................49
Section 24.1    Cooperation...........................................................................49
Section 24.2    Certain Decisions. ..................................................................49
Section 24.3    Loan Components. ..................................................................49
Section 24.4    Costs....................................................................................50
Section 24.5    Conversion of Loan and Creation of Subordinate Debt.............50
Section 24.6    Securitization Indemnification....................................................50
Section 24.7    Rating Surveillance. ................................................................52

HF 3329787v.8 #04737/0110 07/21/2006

## LOAN AGREEMENT

Project commonly known as "Logan Cabo San Cristobal",

Cabo San Lucas, Baja California Sur, Mexico

THIS LOAN AGREEMENT (this "Agreement") is made as of July 21, 2006, between LOGAN HOTELS AND RESORTS, MEXICO, S.A. DE C.V., a Mexican corporation ("Borrower"), and LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("Lender").

## RECITALS

A.    Borrower has applied to Lender for a loan in an amount up to $65,000,000 (the "Loan"). The Loan shall be used to fund acquisition and pre-development costs in respect of the Land (hereinafter defined) and such other costs as are set forth in the Budget (hereinafter defined); and

B.    As security for Borrower's obligations under this Loan Agreement and the other Loan Documents (hereinafter defined), Borrower has on this date conveyed all of its right, title and interest in the Land to HSBC MEXICO, S.A., ("Trustee"), as Trustee under a Trust Agreement dated as of the date hereof among Borrower, Lender and Trustee (the "Trust Agreement").

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## INCORPORATION OF RECITALS AND EXHIBITS

Section 1.1    Incorporation of Recitals.

The foregoing preambles and all other recitals set forth herein are made a part hereof by this reference.

Section 1.2    Incorporation of Exhibits.

The Exhibits to this Agreement are incorporated in this Agreement and expressly made a part hereof by this reference.

## ARTICLE II
## DEFINITIONS

Section 2.1    Defined Terms.

The following terms as used herein shall have the following meanings:

Additional Fee:  The greater of (i) $65,000,000 (plus the increased principal amount of the Loan, if any, resulting from any Interest Reserve implemented after the Effective Date), less

all interest theretofore paid by Borrower on account of the Loan and any Mezzanine Loan and (ii) an amount equal to a cumulative return of 25% on the principal amount of the Loan and any Mezzanine Loan outstanding from time to time, calculated for any period on the basis of a 360-day year and the actual number of days elapsed in such period, compounded monthly.

Affiliate:  With respect to a specified Person, any Person which, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, including, without limitation, any general or limited partnership in which such Person is a partner.

Affiliate Fees: All fees, commissions and other amounts which have been or are intended to be paid by or on behalf of any Borrower Party or any Affiliate of any Borrower Party in connection with the acquisition or financing of the Property or the Project, including, without limitation, a payment by the seller under the Purchase Agreement or by any Affiliate of such seller.

Agreed Terms and Conditions:  With respect to any Opportunity, (1) a rate or structure such that (A) with respect to a senior priority construction loan, Lender receives a 20% per annum internal rate of return, calculated on the amount of drawn funds, compounded monthly, or (B) with respect to any other Opportunity a rate or structure to be based on then "market" terms for such an Opportunity, and (2) in either case, on other "market" terms and conditions.  For purposes of the foregoing, the term "market" means not substantially different from those then provided by Lehman and other institutional lenders in similar transactions in either Cabo, Mexico for substantially comparable beach resort development projects, or for beach resort development projects in other beach resort locations outside of the United States of America.

Agreement:  This Loan Agreement.

Applicable Phase Designee:  As defined in Section 16.1(b).

Applicable Designee Trust:  As defined in Section 16.1(b).

Applicable Phase Mezzanine Loan Amount:  An amount equal to the Minimum Release Price for the Phase to which an Opportunity was presented (as improved by the Improvements completed thereon).

Applicable Phase Mezzanine Loan Documents:  The Applicable Phase Mezzanine Note, the Applicable Phase Mezzanine Loan Pledge Agreements, the Applicable Phase Mezzanine Loan UCC Financing Statements, a reaffirmation of all Loan Documents in form and substance satisfactory to Lender and such other documents or instruments (including certificates of shares, or equivalent, and transfer powers) as Lender shall require to evidence or secure a Mezzanine Loan applicable to any Phase.

Applicable Phase Mezzanine Loan Financing Statements:  Such UCC Financing Statements as Lender shall require in connection with the execution and delivery of the Applicable Phase Mezzanine Loan Pledge Agreements.

Applicable Phase Mezzanine Note:  As defined in Section 16.1(b).

2

HF 3329787v.8 #04737/0110 07/21/2006