```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
FCCD LIMITED,                           :    10 Civ. 1632 (DLC)
                   Plaintiff,           :
         -v-                            :    OPINION & ORDER
                                        :
STATE STREET BANK AND TRUST COMPANY and :
TRIMONT REAL ESTATE ADVISORS, INC.,     :
                                        :
                   Defendants.          :
                                        :
----------------------------------------X
```

Appearances:

For Plaintiff:
Jacob S. Pultman
Reginald Schafer
Allen & Overy LLP
1221 Avenue of the Americas
New York, NY 10020

For Defendant State Street Bank and Trust Company:
Jared R. Clark
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022

Sabin Willett
Eric Heining
Bingham McCutchen LLP
One Federal Street
Boston, MA 02110

For Defendant TriMont Real Estate Advisors, Inc.:
Ian Michael Goldrich
Kilpatrick Stockton LLP
31 West 52nd Street, 14th Floor
New York, NY 10019


DENISE COTE, District Judge:

    Plaintiff FCCD Limited ("FCCD"), the holder of a senior

1

interest in a commercial real estate loan, has brought this action for breach of the loan agreement against the holder of the subordinate interest in the loan, State Street Bank and Trust Company ("State Street"), and the servicer of the loan, TriMont Real Estate Advisors, Inc. ("TriMont").  This Opinion addresses the parties' cross-motions for summary judgment.

BACKGROUND

The Complaint asserts three causes of action against State Street:  declaratory judgment, breach of contract, and breach of the implied covenant of good faith and fair dealing.  It also asserts a claim for tortious interference with contract against TriMont.  The Complaint principally asserts that State Street breached its obligation under the loan agreement to transfer control over the loan to FCCD, the senior interest holder, in the event of a default by the borrower.  FCCD alleges that State Street is thwarting the overarching design of the loan agreement -- to ensure that the party with control over the loan has a sufficient economic stake in the loan that it has an incentive to make sound decisions.

The following facts are not in dispute.  On July 21, 2006, Lehman Brothers Holdings Inc. ("Lehman") entered into an agreement (the "Loan Agreement") with a Mexican land developer, Logan Hotels and Resorts, Mexico, S.A. De C.V. (hereinafter the

2

"Borrower") to provide a loan (the "Loan") of up to $65 million. The Loan was secured by a first mortgage lien on 840 acres of vacant land located in the City of Los Cabo, Baja California Sur, Mexico.  At the time of the Loan, the property was appraised as having a value of $58.8 million; by the end of 2007, it had increased in value to well over $100 million.  The Borrower intended to use the Loan to construct "hotels, villas and fractional beach residences" in addition to "an 18 hole golf course, a retail village, and additional residential developments."  Because the property would not generate income during the development phase, the Loan Agreement provided that "[a]ll principal, interest and other sums due under the Loan Documents . . . shall be due and payable in full on the Maturity Date."

On January 19, 2007, Lehman entered into a Loan Participation Agreement (the "Participation Agreement") with FCCD whereby it sold to FCCD a senior interest in the Loan.  The preamble to the Participation Agreement provided,

> Lehman has agreed to sell and transfer to Senior
> Participant, and Senior Participant has agreed to
> purchase and receive from Lehman, an undivided
> senior participation interest in the Loan on the
> terms and conditions set forth in this agreement
> (such senior participation interest in the Loan
> being hereinafter referred to as "Senior
> Participant's Participation"; the subordinate
> interest in the Loan which is retained by Lehman
> is hereinafter referred to as the "Lehman
> Interest").

3

The term "Lehman's Pro Rata Share" was defined to mean "the percentage obtained by dividing (x) the sum of the aggregate unpaid principal amount of the Loan less the unpaid principal amount of the Participation Amount by (y) the aggregate unpaid principal amount of the Loan."  The Participation Agreement further provided that FCCD was to receive payments of interest at a rate of 12.5%, while Lehman would continue to receive interest at the 15% rate as set forth in the Loan Agreement.  The Participation Agreement specified that it was an integrated written contract and that its interpretation would be governed by New York law.

In the event of a default by the Borrower, the "Waterfall" provision of the Participation Agreement contemplated that FCCD, as the senior interest holder, would have first priority in reimbursements of principal and interest:

> At any time that an Event of Default shall have occurred and be continuing, all amounts received by Lehman with respect to the Loan shall be applied to the extent of all such received amounts in the following order of priority:  (A) first, to pay to Servicer any Unreimbursed Costs; (B) second, to pay to Senior Participant interest on the outstanding Senior Participation Amount at the Interest Rate; (C) third, to pay to Senior Participant the Participation Amount; (D) fourth, to pay to Lehman all sums due and payable to Lehman other than its portion of the Additional Fee; (E) fifth, to pay to Senior Participant the Senior Participant Additional Fee; and (F) finally, the balance to Lehman.

This structure explains why Lehman's interest was considered

"subordinate" to that of FCCD:  if the loan suffered a loss, Lehman's interest would be the first to absorb that loss.  In exchange for assuming the riskier participation in the loan, Lehman was compensated at a higher interest rate than FCCD.

As the holder of legal title to the Loan, Lehman retained "the sole and exclusive authority with respect to the administration of, and exercise of rights and remedies with respect to, the Loan."  This included the right to control the collection of payments of principal and interest, known as the "servicing" of the loan.  The Participation Agreement specifically empowered Lehman to appoint a servicer of the loan.  Control over the servicing of a loan gives the lender "the ability to control essential decision making with respect to enforcement of a loan following a default."

Lehman's right to service the loan under the Participation Agreement was not absolute, however.  In the event of a default on the Loan, the Participation Agreement provided that the right to service the loan would be transferred to the senior interest holder if the subordinate interest holder's prospect of recovery was so diminished that it could no longer be said to have a sufficient economic stake in the Loan.  The Participation Agreement set forth a formula for determining whether control of the Loan should be transferred from the subordinate to the senior interest holder:

5

> "Control Appraisal Period" shall be deemed to have occurred if and so long as (a) (i) the Lehman Interest Principal Balance, plus the Undisbursed Lehman Interest, minus (ii) the sum of (A) any payments of principal (whether as prepayments or otherwise) allocated to, and received on, the Lehman Interest, (B) any Appraisal Reduction Amounts allocated to the Lehman Interest, and (C) any Realized Principal Loss allocated to the Lehman Interest, is less than (b) twenty-five percent (25%) of the Lehman Interest Principal Balance plus the Undisbursed Lehman Interest.  Notwithstanding the foregoing, a Control Appraisal Period shall not be deemed to exist if Lehman posts additional collateral to mitigate the effect of any Appraisal Reduction Amount.

(Emphasis supplied.)  The initial version of the Participation Agreement did not include the Control Appraisal provision, which was added at the suggestion of FCCD, including the phrase "Appraisal Reduction Amounts allocated to the Lehman Interest."

Determination of whether a Control Appraisal Period had been triggered required a calculation of the "Appraisal Reduction Amount" as follows:

> "Appraisal Reduction Amount(s)" shall mean an amount equal to the excess, if any, as of the related determination date, of (a) the sum of (i) the outstanding principal balance of the Loan, plus (ii) to the extent not previously advanced by Servicer, all accrued and unpaid interest (other than default interest) on the Loan at a per annum rate equal to the applicable interest rate (exclusive of any default interest), plus (iii) all unreimbursed Costs and unpaid interest thereon at the Applicable Servicer Rate and any unpaid interest on any principal and interest advances with respect to the Loan, plus (iv) all currently due and unpaid real estate taxes and assessments and insurance premiums relating to the Premises (less any amounts held in escrow for such items) over (b) an amount equal to the Collateral Value of the Premises as determined

6

>     by an appraisal performed pursuant to this Agreement
>     or during the one year period preceding such Control
>     Appraisal Period . . . .

By an assignment agreement with an effective date of September 17, 2008, State Street purchased Lehman's subordinate interest in the Loan. Lehman had appointed TriMont as servicer of the Loan, and State Street continued to employ TriMont in that capacity after it assumed the Loan from Lehman.

The Loan matured on July 1, 2009, with an outstanding principal balance of $66,445,079.87 and an outstanding accrued interest balance of $31,380,638.57. The Borrower's failure to pay these outstanding amounts by the maturity date constituted an "Event of Default" under the terms of the Loan Agreement.

On July 17, 2009, FCCD wrote to State Street and TriMont to request that they deliver a notice of default to the Borrower, immediately order an appraisal of the property securing the Loan, and commence foreclosure. On December 1, copies of an appraisal report valuing the property at $67 million (down from its high of $100 million in 2007) were circulated to FCCD, State Street, and TriMont.

On December 2, TriMont informed FCCD and State Street that based on the appraisal of the value of the land at $67 million it had determined that a Control Appraisal Period was not triggered. TriMont provided supporting calculations which showed that it calculated the Appraisal Reduction Amount as $25,588,811. This

figure is not disputed by the parties.  TriMont's calculations further showed that it construed the phrase "Appraisal Reduction Amounts allocated to the Lehman Interest" to require that it allocate to State Street its pro rata share of the Appraisal Reduction Amount, here 48.77%, to determine whether a Control Appraisal Period had occurred.

FCCD filed its Complaint in the Supreme Court of New York on February 5, 2010.  State Street and TriMont filed a notice of removal to federal court on March 1.  On March 15, State Street answered the Complaint and asserted two counterclaims against FCCD:  it requested the entry of a declaratory judgment that no Control Appraisal Period has occurred, and it also asserted a claim for tortious interference with contract against FCCD.

On October 29, FCCD moved for partial summary judgment on its claim against State Street and TriMont for a declaratory judgment that a Control Appraisal Period has been triggered under the terms of the Participation Agreement.  On November 19, State Street moved for summary judgment on all three claims asserted by FCCD against it and on its counterclaim for a declaratory judgment.  Also on November 19, State Street moved to strike the expert declarations of Daniel Smith ("Smith") and Joshua Stein ("Stein") submitted by FCCD in support of its motion for summary judgment.  The motions were fully submitted on December 17, 2010.

DISCUSSION

FCCD primarily contends that to be consistent with the Participation Agreement's provision that the subordinate interest bear the first loss in the event of a foreclosure, TriMont should have allocated the <u>entire</u> amount of the Appraisal Reduction Amount to the subordinate interest in calculating the Control Appraisal Period.  State Street counters that FCCD's interpretation of the Participation Agreement renders contract language superfluous.  It is undisputed that a Control Appraisal Period would be triggered if the entire Appraisal Reduction Amount were allocated to the subordinate interest, in which event State Street would be required to transfer the control rights to the Loan to FCCD.  Both State Street and FCCD seek a declaration that their respective interpretations of the contract language are unambiguous and govern here.

Summary judgment is "'appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.'"  <u>Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC</u>, 2010 WL 5064377, at *4 (2d Cir. Dec. 9, 2010) (quoting <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149 (2d Cir. 1998)). "The role of the court in deciding a motion for summary judgment 'is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving

ambiguities and drawing reasonable inferences against the moving party.'" Wilson v. Northwestern Mut. Ins. Co., 625 F.3d 54, 59-60 (2d Cir. 2010) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986)).

On a motion for summary judgment in a contract case the court must first answer the question of "whether the contract is unambiguous with respect to the question disputed by the parties." International Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002). The threshold question of ambiguity is a matter of law for the court to decide. Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010).

The parties do not dispute that according to the terms of both the Loan Agreement and the Participation Agreement, New York law is controlling here. Under New York law, an

> ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

Id. (emphasis supplied and citation omitted).

> No ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion. Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation,

> unless each is reasonable interpretation. Thus, the court should not find the contract ambiguous where the interpretation urged by one party would strain the contract language beyond its reasonable and ordinary meaning.

Id. at 467 (citation omitted). Further, to determine whether disputed contract language is ambiguous, the Court must ask whether it is "ambiguous when read in the context of the entire agreement; [] where consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity." Id. (citation omitted).

The Second Circuit recently addressed the issue of whether under New York law evidence as to custom and usage in the industry can be properly considered by the court in determining whether the contract is ambiguous:

> Evidence as to [] custom and usage is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized. When the parties have used contract terms which are in common use in a business or art and have a definite meaning understood by those who use them, but which convey no meaning to those who are not initiated into the mysteries of the craft, the parties, in order to have the court construe their contracts, must furnish the court with the dictionaries they have used. In such circumstances, the court must be informed of the meaning of the language as generally understood in that business, in light of the customs and practices of the business.

Id. at 466 (citation omitted). In sum, evidence as to custom and usage may be appropriately considered by the court "to show what the parties' specialized language is fairly presumed to have

meant." Id. at 467 (citation omitted).

The Smith and Stein declarations are properly considered in making the threshold ambiguity determination with respect to the disputed language in the Participation Agreement.  Both Smith and Stein opined on standard industry practice in structuring intercreditor agreements.  The two experts noted that "change of control" provisions such as the Control Appraisal Period at issue here are commonly found in intecreditor agreements.  Both experts offered interpretations of the Control Appraisal Period language that were informed by their understanding as to the standard division of risk in intercreditor agreements.  They explained that the change-of-control provisions are meant to reflect the division of loss in the event of foreclosure.  Thus, the two experts explained what the Control Appraisal Period is "fairly presumed" to mean as measured by standard industry practice.

State Street contends that a court may only receive evidence on industry custom and practice to aid in contract interpretation when the term or phrase at issue has a standard, fixed meaning in the industry.  "[P]roof of custom and usage consists of proof that the language in question is fixed and invariable in the industry in question."  Id. at 466 (citation omitted).

Since the word "allocate" in the Control Appraisal Period provision is not a term of art, according to State Street, the Court may not receive expert testimony as to industry practice in

12

fashioning or interpreting similar change-of-control provisions in loan participation agreements.  State Street relies on <u>Law Debenture</u>, 595 F. 3d 458 (2d Cir. 2010), which upheld the district court's refusal to consider custom and usage evidence in construing an indenture agreement.  <u>Id</u>. at 469-70.  But the <u>Law Debenture</u> court held only that the evidence there failed to establish the existence of an industry-wide practice; it fell "well short of showing any 'uniform and unvarying,' 'general and not personal' custom" in the industry.  <u>Id</u>.  Thus, the decision does <u>not</u> stand for the proposition that evidence which fairly establishes the existence of fixed industry custom cannot be considered by the district court in determining ambiguity.  Moreover, while the term "allocate" does have an everyday meaning, it also has a specialized meaning in the context of intercreditor agreements.  Smith and Stein's opinions as to how risk is typically "allocated" in change of control provisions aids in the interpretation of the language at issue here and will be considered.

State Street also contends that Smith's report should be excluded because the record allegedly reflects that the substance of the report was supplied by counsel.  A review of the record reveals that this contention is unfounded.  Following his initial communication with counsel for FCCD on or around September 10, 2010, Smith testified that he had at least four telephone

13

conversations with counsel in which he verbally communicated the substance of his opinions.  Smith further noted that he reviewed all of the relevant documents, such as the Participation Agreement, prior to communicating his conclusions to counsel.  Counsel then drafted a report based on Smith's communications; Smith reviewed the report and relayed "minor comments" to counsel.  On September 17, Smith reviewed the report one last time and signed it after ascertaining that he was "comfortable that [his] thoughts had been incorporated into the report."  In sum, Smith testified that although counsel drafted the report, the substance of the report was supplied by Smith.  Thus, Smith's report should not be excluded on the basis that it was "ghost written" by counsel.

The Control Appraisal Period provision, although perhaps not ideally worded, is unambiguous when read in the context of the Participation Agreement as a whole.  The Participation Agreement provides that a Control Appraisal Period will be deemed to have occurred in the following situation:  where the sum of the balance of interest and principal due to the subordinate interest, minus "any Appraisal Reduction Amounts allocated to the Lehman Interest," and minus any realized principal loss allocated to that interest, is less than 25% of "the Lehman Interest Principal Balance plus the Undisbursed Lehman Interest."  The Appraisal Reduction Amount measures the loss to the Loan as a

14

whole upon foreclosure if all of the collateral were sold for fair market value and the proceeds were applied against the Loan. This reading is consistent with the sole purpose of the formula for identifying a Control Appraisal Period, that is, determining the point at which decision-making authority transfers to the senior interest holder.

A term of the Control Appraisal Period speaks of "any Appraisal Reduction Amounts allocated to the Lehman Interest." At first blush this language would appear to raise the possibility of a scenario in which less than the total of the Appraisal Reduction Amount would be allocated to the Lehman (or subordinate) interest.  This result would be illogical, however, for the simple reason that because the Appraisal Reduction Amount is an estimate of the loss to the loan as a whole upon foreclosure, it must be allocated entirely to the subordinate interest in order to parallel the foreclosure provision.

In the event of a default, the Participation Agreement provides the "order of priority" for reimbursement.  Under that provision, the senior interest takes priority over the subordinate interest -- it is to be reimbursed in full (both principal and interest) before the subordinate interest recovers anything.  As Smith and Stein explained in their respective reports, the Control Appraisal Period is designed to gauge, at any given moment in time, the potential recovery of the

15

respective interests in the event of foreclosure.  If upon foreclosure the subordinate interest would "no longer [have] a meaningful economic interest in the loan and [would] no longer [have] an incentive to enforce the loan in a commercially reasonable manner for the interests of the lender group as a whole," then the Control Appraisal Period is triggered and shifts control over the loan to the senior interest.  Because the Control Appraisal Period formula is designed to measure recovery in the event of foreclosure, the only reasonable way to read that provision consistent with the settled custom and usage of the industry is to apply the loss allocation set forth in the foreclosure provision; that is, the entire loss must be allocated to the subordinate interest in order to simulate the allocation of loss upon foreclosure.

 Stein provided an example illustrating that the interpretation advanced by State Street and TriMont, which would allocate the Appraisal Reduction Amount based on the subordinate interest's pro rata share, would produce an absurd result.  In Stein's example, the collateral is worth so little by the time of default that it is highly unlikely that the subordinate interest would recover anything upon foreclosure.  Despite the fact that the subordinate interest is essentially worthless, it would still retain control rights over the loan if one were to employ State Street's method of calculating the Control Appraisal Period.

16

That is, a Control Appraisal Period would not be triggered even though the subordinate interest no longer has a significant economic stake in the collateral.  This result cannot reasonably have been intended by the parties, and there is insufficient support in the language of the documents to find that they did so intend.

FCCD's interpretation of the phrase "any Appraisal Reduction Amounts allocated to the Lehman Interest" is further supported by the fact that the term "Lehman's Pro Rata Share" is defined in the Participation Agreement and thus could have been employed by the parties in place of the "Lehman Interest" language.  Had the parties intended to indicate that the subordinate interest's pro rata share of the Appraisal Reduction Amount should be used in determining whether a Control Appraisal Period exists, they could have written "Lehman's Pro Rata Share of the Appraisal Reduction Amount."  Instead, they chose to use the term "Lehman Interest," which is defined by the Participation Agreement as the "subordinate interest" in the Loan based on the "terms and conditions" of the Participation Agreement.

State Street argues that the use of the word "any" in the phrase "any Appraisal Reduction Amounts allocated to the Lehman Interest" demonstrates that the parties contemplated situations in which Appraisal Reduction amounts would not be allocated to the subordinate interest.  There is an alternate explanation for

17

the use of "any," however, which is that there may be situations in which there would be no loss to the loan upon foreclosure and therefore no Appraisal Reduction Amount.  Thus, the parties employed the word "any" to signify that an Appraisal Reduction Amount may not exist.

State Street further argues that FCCD's interpretation of the Control Appraisal Period language renders the phrase "to the Lehman Interest" superfluous, since under FCCD's interpretation, the Appraisal Reduction Amount will always be allocated to the subordinate interest.  While it is true that "to the Lehman Interest" language may not be strictly necessary under FCCD's interpretation, the interpretation offered by State Street renders the entire provision at odds with the design of the contract as a whole.  A small redundancy is preferable to an unreasonable result.  Accordingly, the Control Appraisal Period language must be read to allocate the entire Appraisal Reduction Amount to the subordinate interest.  As a result, FCCD has shown that the terms of the Participation Agreement that are at issue here are unambiguous when read in the context of the entire contract, informed by an understanding of the custom and usage of intercreditor agreements, and that it is entitled to a declaration that a Control Appraisal Period has been triggered and that the control rights to the Loan should therefore be transferred to FCCD.

State Street has also moved for summary judgment on FCCD's claim for breach of the implied covenant of good faith and fair dealing. New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life and Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002). As a consequence, State Street is entitled to a judgment in its favor on FCCD's claim for breach of the implied covenant of good faith and fair dealing.

## CONCLUSION

FCCD's October 29, 2010 partial motion for summary judgment is granted and State Street's November 19, 2010 cross motion for summary judgment is granted in part. FCCD is entitled to a judgment on its declaratory judgment claim; State Street's claim for judgment on FCCD's claim for breach of the implied covenant of good faith and fair dealing is granted. A separate order will address the schedule for the remainder of this litigation.

SO ORDERED:

Dated: New York, New York
February 15, 2011

_____
DENISE COTE
United States District Judge

19